RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0281p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

Nos. 06-3580/3635/3640/3942

CIRILO TORRES-RAMOS (06-3580); JOSE SERVIN
(06-3635); RUDOLPH E. RHABURN (06-3640);
ALARIC F. SIMON (06-3942),

*Defendants-Appellants.*

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 04-00086—Walter H. Rice, District Judge.

Argued: June 4, 2008

Decided and Filed: August 7, 2008

Before: MERRITT, CLAY, and GILMAN, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Michael L. Monta, MONTA & MONTA, Dayton, Ohio, Andrew P. Avellano, Columbus, Ohio, Michael J. Brennan, Manhattan Beach, California, Mark Joseph Wettle, LAW OFFICE, Louisville, Kentucky, for Appellants. Benjamin C. Glassman, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Michael L. Monta, MONTA & MONTA, Dayton, Ohio, Andrew P. Avellano, Columbus, Ohio, Michael J. Brennan, Manhattan Beach, California, Mark Joseph Wettle, LAW OFFICE, Louisville, Kentucky, for Appellants. J. Richard Chema, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee.

_____

### OPINION

_____

### I.

MERRITT, Circuit Judge. In this appeal, four defendants challenge their convictions for conspiracy with the intent to distribute five or more kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1). Two of the defendants, Cirilo Torres-Ramos and Jose Servin, entered conditional guilty pleas and now argue that the district court erred by not granting their motions to suppress the government's search and seizure relating to the cocaine, which was found in a van in which both defendants were traveling. Defendants Rudolph Rhaburn and Alaric Simon proceeded to a jury trial,

where both were convicted of the conspiracy charge. They contend that the court made a number of errors and challenge, *inter alia*, the district court's determination that probable cause existed to make the initial arrests and the court's denial of the defendants' Rule 29 motions challenging the sufficiency of the evidence. Defendant Simon also contends that the prosecution impermissibly struck a black juror in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).

For the following reasons, we affirm both the district court's denial of Torres-Ramos' and Servin's motions to suppress the evidence and the conviction of Rhaburn. Because the district court's ruling on Simon's *Batson* challenge was based on incomplete information, we remand with instructions to reconsider its conclusion in light of the additional evidence discussed in this opinion.

## II.

### *Part A.  Facts related to defendants Servin and Torres-Ramos*

On May 26, 2004, Ohio State Trooper Chris Coverstone stopped a blue GMC van with Washington state plates for speeding (72 mph in a 65 mph zone) on Interstate 75 in Shelby County, Ohio. After executing the traffic stop, which occurred at 11:13 a.m., Coverstone asked the driver, Janette Reynaga, to step out of the van, informed her that he had stopped her for speeding, and asked for her driver's license and registration for the van. Reynaga immediately gave Coverstone the van's registration, but did not have her driver's license on her person. During this initial encounter, which lasted until approximately 11:15 a.m., Coverstone asked Reynaga a series of questions related to the van's owner (who was not present), her travel companions, and her travel plans. Coverstone later testified that Reynaga acted nervously during this initial encounter (*e.g.* avoiding eye contact) and failed to fully answer basic questions, including the last name of the van's owner. Specifically, Reynaga stated that her "Aunt Paula" owned the van; however, she was unable to provide Aunt Paula's last name. (She explained to Coverstone that her aunt had recently married and changed her last name.)

While Reynaga returned to the van to retrieve her license, Coverstone learned that the van was registered to Paula Rojas Demechor of Vancouver, Washington. Upon returning from the van, Reynaga first produced an identification for Jose Servin, one of the passengers, and then handed Coverstone her valid California driver's license, which indicated that she was from the Compton area of Los Angeles. Coverstone then asked Reynaga to come with him to his patrol car, where he put her in the vehicle. On the way to the car, Coverstone contacted his dispatcher to request that Sergeant Jeff Gilman be sent to the scene along with his drug detection dog, Emir.

Coverstone then returned to the van and began questioning the passenger in the van whose identification Reynaga had produced earlier, Jose Servin. Servin responded differently to a number of the questions that Coverstone had earlier posed to Reynaga, including the nature of their travel plans and their relationship to the van's owner. Reynaga had earlier explained that she and her four companions had flown from Los Angeles to Vancouver, Washington, where they had picked up the van from Aunt Paula in order to drive to visit a friend in Dayton, Ohio. She was unable to specify a flight number, but indicated that it was an American Airlines flight. Servin told Coverstone that Aunt Paula had driven the van from Vancouver to Los Angeles in order to give him the van so that he could drive cross-country to visit his Aunt Ernestino, also in Dayton, Ohio. Additionally, Coverstone testified that he detected a strong odor of an air freshener coming from the van while he questioned Servin. According to Coverstone, his experience as an officer led him to believe that strong air fresheners were often used by drug dealers to mask the odor of narcotics.

Upon returning to his cruiser, Coverstone contacted his dispatcher to ask for information related to Reynaga, Servin, and the vehicle in which they were traveling. He learned that Servin had previous criminal activity. He also contacted the Drug Enforcement Agency (DEA) center in El Paso, Texas, to inquire about the occupants of the van and Demechor, the owner of the vehicle. The

DEA indicated that Demechor and her residence were the subject of a "Title III" investigation (i.e. a wiretap).

Approximately 35 minutes after the initial traffic stop,[1] Gilman arrived with his dog, Emir. As Gilman walked around the van, the dog alerted. At that point, the officers removed the other passengers from the van, including defendant Torres-Ramos, and placed them in police vehicles. A subsequent search of the rear door panel revealed nine kilograms of cocaine in plastic wrapping. Coverstone then issued the *Miranda* warning and asked Servin if he would be willing to help arrange a "controlled delivery" of the cocaine. Servin responded that he was willing to assist in the delivery. Coverstone then proceeded to contact local DEA authorities to assist in the controlled buy with Servin's assistance.

### Part B.  Facts related to defendants Rhaburn and Simon

Servin told investigators that he was in contact with a man he knew as "Cricket" and that he had twice previously delivered cocaine to this individual at the same location. Servin described Cricket as a black male with "high hair" and further stated that the delivery would take place at a Country Inn Suites motel, located one exit south of the junction with Interstate 70. The officers also learned from Servin that Cricket drove an early 1990s blue or gray Oldsmobile. Based on this information, local police, together with the DEA agents and state officers, set up surveillance at the Country Inn and its surroundings.

In order to execute the controlled buy, law enforcement officials drove the blue van to the motel and left a DEA officer in the van to conduct surveillance. Approximately 15 other law enforcement officials were located in the area, including three in a neighboring Arby's restaurant. In addition, DEA agent Jack Delrio rented a room at the Country Inn, which he occupied with Servin. (While in the room, Delrio learned that Servin had been in phone contact with Cricket during the earlier traffic stop, but that he had merely indicated that they were being pulled over.) Servin then received another phone call from Cricket, who indicated that he would meet at the same location as earlier deliveries, *i.e.* a Country Inn room. Shortly after this phone call ended, at approximately 6 p.m., defendants Simon and Rhaburn arrived in an Oldsmobile that matched Servin's description of the vehicle driven by Cricket at the previous deliveries.[2] The two pulled into the motel parking lot and then walked into an Arby's restaurant that adjoined the lot.

Subsequently, a man later identified as Paredes-Lima[3] left a room at the Country Inn, walked over to Arby's, and proceeded to converse with Simon and Rhaburn. He then left the Arby's, walked over to the van, and inspected it by trying to look into the windows (which were tinted) and by attempting to make contact with anyone who might be inside by whispering "psst!" and "hey." Paredes-Lima then returned to the Arby's, where he briefly joined Simon and Rhaburn before going back to the motel. Thereafter, Simon and Rhaburn left Arby's, got back into the Oldsmobile, and drove over to the van, where they stopped twice to examine it. As they were driving away from the

---

[1] Trooper Coverstone had not issued any citation for a traffic violation at this time, nor had he started to write one.

[2] Conflicting evidence exists as to whether the officers expected just Cricket (i.e. Rhaburn), or whether they also expected Simon to be present at the controlled buy. Servin had told investigators that on previous occasions, Cricket had been accompanied by another man.

[3] The law enforcement officials had no information that Paredes-Lima or any other Hispanic individuals would be involved in the buy. Paredes-Lima was also charged in the conspiracy after his fingerprints were discovered on the packaging of the cocaine found in the van.

van, Coverstone stopped the car and arrested the two defendants based on his supervisor's determination that probable caused existed for their arrests.

Following the arrest, the police seized evidence from the car that identified Simon as having been with Rhaburn during Servin's previous deliveries of cocaine in Dayton. The police also learned after the arrest that Simon had rented a room at the Country Inn for the dates corresponding to the delivery, May 24-26, 2007, and also collected a cell phone and a number of receipts from the Oldsmobile that indicated that the two men had recently been in California.

### *Part C.  Procedure*

Each of the defendants filed a motion to suppress the cocaine found in the blue van. The district court denied these motions, however, after finding first that none of the defendants had a reasonable expectation of privacy in the van (*i.e.* the area searched), which prevented them from challenging the search. In addition, the court rejected the defendants' argument that the evidence was the fruit of an illegal seizure. The district court concluded, moreover, that Coverstone had reasonable suspicion that criminal activity was afoot, thereby permitting him to extend the scope of the initial traffic stop.

Defendants Servin and Torres-Ramos, both of whom were passengers in the van, entered conditional guilty pleas and challenge the district court's ruling on their motions to suppress as well as other issues related to the search of the van. Servin received a ten year sentence, the mandatory minimum for an individual with prior convictions based on the weight of cocaine involved, while Torres-Ramos received 54 months.[4] Defendants Rhaburn and Simon, who were arrested at the Country Inn motel, proceeded to a jury trial where they were both convicted of conspiracy to distribute cocaine. Rhaburn was sentenced to 121 months imprisonment, while Simon received a term of 120 months.

### III.

Defendants Torres-Ramos and Servin argue in this appeal that the district court erred by not granting their motions to suppress the cocaine seized from the van. The grant of a motion to suppress is a mixed question of law and fact. *United States v. Hurst*, 228 F.3d 751, 756 n.1 (6th Cir. 2000). We review the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Dillard*, 438 F.3d 675, 680 (6th Cir. 2006). Because the district court denied the defendants' motions to suppress, we review all evidence in the light most favorable to the government. *United States v. Long*, 464 F.3d 569, 572 (6th Cir. 2006).

We first must address the threshold issue of standing. According to the district court, the defendants lacked standing to contest the search of the vehicle because, as the Supreme Court held in *Illinois v. Rakas*, passengers do not have a reasonable expectation of privacy in a searched vehicle. 439 U.S. 128 (1978). We agree that *Rakas* controls this particular issue and that the defendants did not have a reasonable expectation of privacy in the van. However, even in cases where no reasonable expectation of privacy exists, a passenger [defendant] "may still challenge the stop and detention and argue that the evidence should be suppressed as fruits of illegal activity." *United States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007) (quoting *United States v. Ameling*, 328 F.3d 443, 447 n.3 (8th Cir. 2003)); *see also Wong Sun v. United States*, 371 U.S. 471 (1963) (explaining the fruits of the poisonous tree doctrine). We therefore held in *Ellis* that a passenger "possesses standing to challenge his unlawful seizure and the evidence that flowed from the search and seizure." 497 F.3d at 612; *see also, United States v. Townsend*, 305 F.3d 357 (6th Cir. 2002)

---

[4] Torres-Ramos had no prior criminal history, which meant that he was not subject to the mandatory minimum of ten years. *See* U.S.S.G. § 5C1.2.

(permitting a passenger to contest evidence resulting from an unlawful detention of a vehicle).[5] Consequently, Torres-Ramos and Servin have standing to contest the legality of their seizure and, by extension, to suppress the fruits of any illegal seizure.

Because Servin and Torres-Ramos have standing to contest their seizure, the question becomes whether Trooper Coverstone had a reasonable and articulable suspicion of criminal activity in order to support his detention of the defendants beyond the initial traffic stop. *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1993). The district court found that reasonable suspicion did exist, which, in turn, defeated the Fourth Amendment challenge.[6] The determination of whether reasonable suspicion exists is a mixed question of law and fact which we review *de novo*. *Townsend*, 305 F.3d at 541 (citing *Ornelas v. United States*, 517 U.S. 690, 697 (1996)). However, due to the institutional advantage the district court possesses – including the ability to observe the testimony of witnesses – "'due weight' should be given to the inferences drawn from the facts by 'resident judges.'" *Townsend*, 305 F.3d at 542 (quoting *Ornelas*, 517 U.S. at 698).

A police officer may legally stop a car when he has probable cause to believe that a civil traffic violation has occurred. *United States v. Sandford*, 476 F.3d 391, 394 (6th Cir. 2007). In this case, it is not contested that Coverstone had probable cause to stop the van for speeding, a civil infraction. Thus, the officer's subjective intent for executing the stop is irrelevant. *See Whren v. United States*, 517 U.S. 806 (1996); *Mesa*, 62 F.3d at 162 ("[P]olice officers [may] stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop."). However, once the purpose of the traffic stop is completed, a police officer "may not 'further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.'" *United States v. Blair*, 524 F.3d 740, 752 (6th Cir. 2008) (quoting *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006)). Thus, in order to detain the motorists beyond the purpose of the original traffic violation, which was to issue a speeding ticket, Trooper Coverstone must have had a reasonable and articulable suspicion that criminal activity was afoot. *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). Otherwise, the continued detention constituted an illegal seizure of the van's occupants. *See Terry v. Ohio,* 392 U.S. 1, 18 (1968).

Before turning to the question of reasonable suspicion, we must define the proper scope and duration of the initial traffic stop. That is, at what point in time did the purpose of the traffic stop end and the detention of the driver and the van's occupants (including the defendants) begin? Resolution of this question determines *which* facts should be considered in the reasonable suspicion inquiry. The issue of when the traffic stop ended is complicated by the fact that Coverstone never[7] began writing a speeding ticket; in fact, he testified that he planned on only warning the driver. Thus, we cannot simply look to the series of events that occurred between the initial stop and the issuing of the traffic violation to determine whether, during this interval, the officers developed

---

[5] The district court, which rendered its decision before *Ellis*, relied on *United States v. Carter*, 14 F.3d 1150 (6th Cir. 1994). There, we held that a passenger did not have standing to contest evidence found as a result of the illegal arrest of the driver because the drugs would have been seized anyway. *Id*. at 1154-55. However, as we noted in *Ellis*, the Supreme Court's recent decision in *Brendlin v. California*, 127 S. Ct. 2400, 2407 (2007), established that all the passengers in a vehicle are seized during a traffic stop. Hence, both a driver and passengers have standing to contest their illegal detention.

[6] The district court found that only Reynaga (who is not a party to this appeal) had standing to challenge the search of the van and thus only considered her challenge as to the existence of reasonable suspicion in the motion to suppress. However, the same facts that the district court considered are also relevant to the instant inquiry into the existence of reasonable suspicion *vis-à-vis* Servin and Torres-Ramos.

[7] The subjective intent of the officer is irrelevant, both before and after the initial stop. *See United States v. Herbin*, 343 F.3d 807, 810 (6th Cir. 2003). Thus, we will treat the initial purpose of the stop as a speeding infraction.

reasonable suspicion to further detain the defendant. *See, e.g., United States v. Garrido*, 467 F.3d 971, 981 (6th Cir. 2006) (holding that officers had reasonable suspicion, based on information learned during the lawful stop, to detain the defendant for additional questioning beyond the 65 minutes it took to conduct a safety check of a vehicle and issue a $200 citation). Nor can we arbitrarily define the scope of the traffic stop by making a finding of fact that a speeding ticket usually takes a certain period of time for an officer to issue. *See Ellis*, 497 F.3d at 609, 614 (holding that the defendant was detained after thirteen minutes because that was the point in time when the officer's questions ceased being "necessitated by the suspected traffic violation" despite the fact the officer testified that it usually took 15 minutes to write a speeding ticket); *Blair*, 524 F.3d at 752 (holding that the purpose of the initial stop ended when the officer had collected sufficient information to issue the citation for the initial traffic stop and that the ensuing detention violated the Fourth Amendment because the officers "had not developed reasonable, articulable suspicion of criminal activity by that point"). With this framework in mind, we turn to the events in the case.

According to the defendants, the traffic stop ended as soon as Trooper Coverstone called the canine unit, *i.e.* two minutes after the initial stop. The district court disagreed, however, and found that the purpose of the traffic stop had not ended at this point because Coverstone had learned that the two occupants were from Los Angeles and yet the owner of the van (who was not present) was from Vancouver, Washington. According to the district court, these facts justified Coverstone's decision to return to the van to question Servin to ensure that the van was lawfully possessed before letting the occupants continue on their trip. The district court, in turn, found that Coverstone developed reasonable suspicion for continuing the detention after speaking with Servin, citing the inconsistencies between his explanation of their travel plans and those offered earlier by Reynaga.

While we agree with the district court's result, we disagree with its reasoning. Issuing a speeding ticket does not require an officer to detain an individual in order to separately question a passenger regarding ownership or travel plans. In this case, therefore, the purpose of the traffic stop ended when Coverstone put Reynaga in his patrol car, which occurred immediately after he called for the canine unit. *See Blair*, 524 F.3d at 752 (noting that once the officer possessed sufficient information to write and issue a tag light violation, any subsequent actions "extended the scope and duration of the stop"). Unless Coverstone had reasonable suspicion that criminal activity was afoot *at this point* in time, the detention violated both Reynaga's and the defendants' Fourth Amendment rights. *See Brendlin*, 127 S. Ct. at 2407. Thus, we must examine whether, at the time Coverstone placed Reynaga in his patrol car, he had developed reasonable suspicion that the van was not lawfully possessed.

The analytical framework for establishing reasonable suspicion under *Terry v. Ohio* involves two steps, beginning with the articulation of specific facts to justify the initial detention. *See United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006). If the detention is proper, then the second question is "whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and surrounding circumstances." *Id.* The government bears the burden of proving, by a preponderance of the evidence, the existence of reasonable suspicion to believe – based upon objective and articulable facts – that the defendants were engaged in criminal activity. *See, e.g., United States v. Rivas*, 157 F.3d 364, 367 (5th Cir. 1998). "Reasonable suspicion is more than an ill-defined hunch; 'it must be based upon a particularized and objective basis for suspecting the particular person . . . of criminal activity.'" *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). In evaluating whether the totality of the circumstances supports the conclusion that reasonable suspicion exists, courts must allow officers to draw upon their experience and training to make inferences. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

Here, the record establishes that Coverstone knew the following facts when he decided to detain the van until after he spoke with Servin:[8] (1) that Reynaga acted nervously in response to his questions; (2) that the van was from Washington state and had tinted windows; (3) that Reynaga was unable to provide the last name of the van's owner (though she did provide a reason, *i.e.* a recent marriage); and (4) that Reynaga's description of her travel plans were vague. With respect to the travel plans, Coverstone was suspicious about Reynaga's claim that she had flown from Los Angeles to Vancouver, Washington to get the van earlier that week, yet could not remember the flight details. Under the totality of the circumstances, we believe that the foregoing facts are sufficient to establish reasonable suspicion that the van was unlawfully possessed, thereby justifying the questioning of a passenger (*i.e.* the defendant Servin).

In *United States v. Garrido*, 467 F.3d 971 (6th Cir. 2006), we surveyed the case law applying the reasonable suspicion framework:

> *Compare United States v. Richardson*, 385 F.3d 625, 630-31 (6th Cir. 2004) (concluding that the motorists' nervousness, their allegedly conflicting explanations of travel plans, and the movement of one from the back to the driver's seat did not suffice to create a reasonable suspicion); *United States v. Townsend*, 305 F.3d 537 at 542-45 (finding that ten factors, including dubious travel plans, three cell phones in the car, and the driver's history of weapons offenses, did not rise to the level of a reasonable suspicion); *and United States v. Smith*, 263 F.3d [571,] 588-94 [6th Cir. 2001] (concluding that nine factors, including the stoned appearance of one vehicle occupant, food wrappers in the car, and the nervousness of the occupants, did not establish a reasonable suspicion); *with United States v. Davis*, 430 F.3d 345, 355-56 (6th Cir. 2005) (holding that a driver's meeting with a known drug dealer justified continued detention until a drug-sniffing dog could arrive, but that additional detention after the dog failed to alert was unreasonable); [*United States v.*] *Hill*, 195 F.3d [258] at 270-73 (concluding that eight factors, including a dubious explanation for a cross-country trip, nervousness, and the cash rental of a U-Haul, justified continued detention); *and United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc) (holding that eight factors, including the lack of registration and any proof of insurance, and the nervousness and criminal record of drug violations of the driver, sufficed to justify continued detention).

*Garrido*, 467 F.3d at 982. The differing outcomes reveal the importance of examining the facts in each specific case; indeed, the Supreme Court observed that, in evaluating reasonable suspicion, "one determination will seldom be a useful 'precedent' for another." *See Townsend*, 305 F.3d at 542 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 n.11 (1983)). Here, we believe that there are two critical and related facts that support Coverstone's initial decision to detain Reynaga until he ascertained whether the van was lawfully possessed. First, she was unable to provide the owner of the van's last name. This failure, together with the fact that the van was over a thousand miles away from the owner's address in Washington, at least supports a reasonable suspicion that it was unlawfully possessed. And second, Reynaga was unable to adequately explain how she had first obtained the van (*i.e.* her inability to recall, with any specificity, her alleged flight from Los Angeles to Washington state earlier that week). Because Coverstone had developed specific and articulable

---

[8]In the instant case, the government attempts to rely on the following additional factors to justify the detention: (1) the odor of the air freshener, which according to Coverstone was a sign of drug dealing based upon his experience; (2) the conflicting story from Servin regarding their travel plans; (3) Servin's inability to provide the last name of the van's owner; and (4) the fact that the owner of the van was the subject of a federal wiretap investigation. However, Coverstone was not aware of these facts until *after* he expanded the detention beyond the traffic stop; thus, they are irrelevant to the inquiry of whether reasonable suspicion existed when Coverstone placed Reynaga in his patrol car on suspicion that the vehicle was stolen.

Nos. 06-3580/3635/3640/3942          *United States v. Torres-Ramos, et al.*          Page 8

facts to detain Reynaga and the van's other occupants beyond the purpose of the original traffic stop, the first prong of the *Terry* analysis is satisfied. We also believe that Coverstone's actions meet the second prong of the *Terry* analysis – to wit, that they were reasonably related in scope to the justification for the continuing detention. Specifically, Coverstone's decision to question a passenger about the van's owner and their travel plans was related to the issue of whether the van was lawfully in their possession. As a result, Coverstone's decision to detain Reynaga and the van's passengers while questioning Servin was lawful.

Upon returning to the van, Coverstone learned additional facts that justified an expansion of the detention beyond its original scope. Indeed, as the district court discussed, Coverstone's discussion with Servin revealed starkly different accounts of the origin of their journey. Servin indicated that they had driven from Los Angeles after "Aunt Paula" delivered the van from Washington, while Reynaga had explained that they had flown to Washington to get the van. In addition, Coverstone learned from the DEA that the van's owner was currently the subject of a Title III wiretap shortly after his conversation with Servin ended. When viewed in their totality, these facts – together with facts we find to have lesser significance such as the odor of air freshener and both Servin's and Reynaga's nervousness – establish the requisite reasonable suspicion that the defendants were involved in the transportation of drugs. The ensuing detention until the canine unit arrived – a total of 35 minutes from the initial stop – falls within the scope justified by this reasonable suspicion.

Thus, we affirm the district court's conclusion that reasonable suspicion existed for the defendants' detention and, by extension, its denial of their motions to suppress the cocaine.

**IV.**

The defendants also argue that the canine, Emir, was insufficiently reliable to establish probable cause to search the car. Emir's reliability controls the issue of whether the officers had probable cause to search the van, for a positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance. *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994). In order for a dog's alert to support a determination of probable cause, "the training and credibility of the dog must be established." *Id.* at 394. The government need not produce actual certification records to establish the reliability of the dog; testimony about the dog's training and reliability suffices. *Hill*, 195 F.3d at 273-74.

The defendants argue that the government failed to adequately demonstrate that Emir was reliable and also contend that Ohio's canine certification process is fundamentally flawed. The district court did not reach the issue of whether Emir was properly certified because it found that the defendants did not have standing to challenge either the search or seizure. Because the defendants do have standing to contest the discovery of the cocaine, we proceed to the merits of this claim.

During the suppression hearing, Sergeant Gilman, Emir's handler, testified that Emir had been certified by three different agencies: the North American Working Dog Association and state accreditation programs in Ohio and Indiana. Additionally, Gilman testified to having personally conducted more than 100 training sessions with Emir, which he documented. To refute the reliability of Emir, the defendants offered the testimony of Dr. Craig, an expert in animal behavior. According to Craig, who has developed a set of training protocols for military working dogs, the training of Emir failed to "certify residual odors [i.e. extinction training – training the dog to ignore odors that would normally excite an animal] or small quantities . . . ." In addition, Craig testified that the Ohio certification process for drug sniffing dogs was inherently flawed. The defendants also urge us to consider the fact that a great deal of currency in the United States is contaminated with trace amounts of cocaine that might cause a dog to alert.

The balance of the testimony at the suppression hearing supports a finding that Emir is reliable. While the defendants' expert witness may have developed a more accurate training protocol, the law does not endorse his prescriptions. Moreover, while Gilman admitted that Emir occasionally alerted during training when no narcotics were present, there is insufficient evidence to suggest that Emir was unreliable. *See, e.g., Diaz*, 25 F.3d at 396 (a low percentage of false positives is not necessarily fatal to a finding that a drug detection dog is properly trained and certified). Gilman testified to the dog's considerable training and prior certifications, which is sufficient to establish his reliability. Because Emir is reliable and actively alerted to the van (*i.e.* he scratched at the location where the cocaine was subsequently found), the government established probable cause for a search of the van.

## V.

Defendants Rhaburn and Simon argue in this appeal that the police lacked probable cause to arrest them, and that the district court's conclusion to the contrary was error. We review a district court's determination of probable cause *de novo*. *Ornelas* 517 U.S. at 699.

In the absence of probable cause, an arrest constitutes an unreasonable seizure in violation of the Fourth Amendment. *Ingram v. City of Columbus*, 185 F.3d 579, 592-93 (6th Cir. 1999). In order to determine whether an arrest was supported by probable cause, we must determine whether, at the time of the arrest, the "facts and circumstances within [the arresting officer's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent" person to conclude that an individual either had committed or was committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). This inquiry requires a court to examine the events leading up to the arrest and then to decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amounted to probable cause." *Marilyn v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas*, 517 U.S. at 696). Courts employ a totality of the circumstances test for probable cause and examine the evidence with respect to each person seized. Probable cause requires officers to "show more than mere suspicion . . . [but] does not require that they possess evidence sufficient to establish a prima facie case at trial, much less evidence to establish guilt beyond a reasonable doubt." *United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998).

The defendants argue, in essence, that while the police observed a third individual (Paredes-Lima) inspect the van and behave in a suspicious manner, the government failed to connect this behavior to the defendants. The government responds by pointing to the following facts: (1) Servin, a passenger in the van, told the officers that he had previously delivered drugs to the same location and also provided a description of Cricket's car; (2) Servin received a phone call while at the motel with law enforcement and indicated that the caller was Cricket; (3) shortly thereafter, a car matching Servin's earlier description of Cricket's car arrived in the motel parking lot and the two defendants got out and walked to the adjoining Arby's; (4) Paredes-Lima left the motel and joined them in the restaurant where all three were observed conversing; (5) Paredes-Lima then walked to the parking lot, examined the van, and then rejoined Rhaburn and Simon in the restaurant; and (6) the two defendants stopped twice to examine the van as they were leaving the lot. According to the government, these facts, when viewed in their totality, indicated that Rhaburn and Simon were engaged in a joint effort to collect the cocaine that they were expecting Servin to deliver.

In support of their argument, the defendants rely primarily on *United States v. Jackson*, 533 F.2d 314 (6th Cir. 1976). In *Jackson*, officers arrested Charles Goff for possession of narcotics. Goff then agreed to assist DEA agents in a controlled buy, informing the agents that he was to meet a woman named Jackson at the local Greyhound stop. He also described Jackson's physical appearance and stated that she would be arriving from California. *Id.* at 315. After observing a woman matching this description, police followed her to a motel. When she saw that she was being followed, Jackson started to leave the area, at which time she was arrested. *Id.* In rejecting a finding

of probable cause for the arrest, we observed that no corroborating information existed to confirm that Jackson was in the process of committing a felony, and that the alleged "confirmation" made by the agents demonstrated only "innocent behavior or suspicious behavior at most." *Id*. at 318. The defendants argue that their behavior also falls below the threshold necessary to establish anything more than suspicious behavior.

The government responds, however, by noting that besides the physical description (as in *Jackson*) the officers in the instant case also observed considerable behavior indicating that a drug deal was afoot. Rhaburn and Simon appeared to conduct counter-surveillance in the parking lot by having Paredes-Lima (whose finger prints were found on the cocaine packaging) investigate the van. The defendants twice stopped to inspect the van – in which nine kilograms of cocaine had been found earlier – as they left the lot. These facts, together with the information provided by Servin, distinguish the case from *Jackson* and satisfy the threshold necessary to support a finding that probable cause existed for their arrests. Because the arrests were legal, the subsequent search incident to the arrests (during which time the police found a number of receipts connecting the defendants to California, as well as at least one cell phone) was also legal.

## VI.

Defendants Rhaburn and Simon also argue that the district court's failure to grant their Rule 29 motion for acquittal based on insufficiency of the evidence resulted in a due process violation. When reviewing a claim of insufficient evidence, we examine the evidence in the light most favorable to the government and draw all inferences in the government's favor in order to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *United States v. Maliszewsik*, 161 F.3d 992, 1005 (6th Cir. 1998) (citing *United States v. Riffe*, 28 F.3d 565, 567 (6th Cir. 1994)). This analysis does not require the removal of every hypothesis except that of guilt. *United States v. Clay*, 346 F.3d 173, 176 (6th Cir. 2003). We review challenges to the sufficiency of the evidence *de novo*. *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000).

The defendants contend that the evidence introduced by the government at trial was insufficient to prove beyond a reasonable doubt that they ever knowingly joined a drug conspiracy. To prove that a defendant is guilty of a drug conspiracy, the government must establish: (1) the existence of an agreement to distribute or possess with the intent to distribute the narcotics; (2) knowledge and intent to join the conspiracy; and (3) actual participation in the conspiracy. *See, e.g., United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005). No formal agreement is required; a tacit understanding among the participants is sufficient. *United States v. Avery*, 128 F.3d 966, 970-71 (6th Cir. 1997). Furthermore, a defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence of a common plan, *Martinez*, 430 F.3d at 330, although mere association with conspirators does not establish participation in a conspiracy. *United States v. Pearce*, 912 F.2d 159, 162 (6th Cir. 1990).

Rhaburn and Simon do not challenge the existence of a drug conspiracy *per se*, but instead dispute the sufficiency of the evidence to prove the element of "knowing" participation. Specifically, they allege that their mere presence at the location where the van was parked does not support a logical inference that the defendants were involved with Servin in the distribution of the cocaine. According to the defendants, the government failed to demonstrate that either had knowledge of the transaction, let alone evidence that they intended to participate in the transaction. They note, for example, that the defendants did not have any cash (or other funds) with them to

purchase the cocaine; Rhaburn also argues that the government did not provide sufficient evidence to identify him as "Cricket."[9]

The government relies on a series of facts to support the conviction. First, they note that it is undisputed that Servin and Torres-Ramos, co-defendants in the case, had transported cocaine from Los Angeles to Dayton with the intent to distribute the drugs. Second, the government relies on Servin's account of his previous deliveries to a man named Cricket at the same location (the Country Inn motel) and the description of the Oldsmobile that Cricket drove, which matched the car driven by the defendants. Third, the government introduced evidence of both defendants' behavior at the Country Inn and Arby's, including their interactions with Paredes-Lima, whose fingerprints were discovered on the cocaine and whose phone records indicated calls with the defendants. Finally, the government provided phone records of a series of phone calls between phones that were registered to Rhaburn, Simon, Paredes-Lima, and Servin on the day of their arrests. The recorded phone call at the motel between Servin and Cricket, for example, matched the phone number of Rhaburn's phone. Phone records also demonstrated that both Simon and Rhaburn had contacted Servin. Other evidence included a receipt indicating that Simon had previously stayed at the same hotel on a date that overlapped with Reynaga, the driver of the van. Based on the foregoing, the government urges us to affirm the lower court's decision, noting that the mere possibility of an innocent argument will not defeat a jury's finding beyond a reasonable doubt that criminal activity occurred. *See, e.g., United States v. Smith*, 138 F. App'x 775, 782 (6th Cir. 2005) ("The fact that [defendant] offered an alternative explanation, however, does not compel a finding that the jury's verdict was unsupported by the evidence.").

The defendants rely on a number of cases where courts have found that the evidence could not support a conspiracy conviction. In *United States v. Layne*, for example, we found that the evidence was insufficient to support a conspiracy conviction under § 841(a)(1) for distributing crack cocaine. 192 F.3d 556, 568-69 (6th Cir. 1999). In that case, the only evidence offered to support the conspiracy was the testimony of one individual who had used crack cocaine with the defendant and his alleged co-conspirators. We rejected the conspiracy conviction and found only a *use* violation, as no evidence existed that the defendant, in concert with the other users, worked together to sell or distribute crack cocaine. *Id.* Conversely, the evidence in the instant case indicates that Rhaburn and Simon (as well as Paredes-Lima) were in contact with Servin and the other passengers of the van and had previously conducted similar deliveries.

Similarly, our decision in *United States v. Peters*, 15 F.3d 540 (6th Cir. 1994), is unhelpful to the defendants. In *Peters*, police officers executing a valid search warrant at Peters' house found another individual, Winton, in the living room. The police discovered crack cocaine, cash, and a weapon in Peters' bedroom; Winton, however, did not possess any contraband, made no incriminating statements, and did not act suspiciously. We explained that given the "dearth of evidence" no rational trier of fact could have convicted Winton of possession of cocaine with the intent to distribute. *Id.* at 544. By contrast, the defendants in the instant case exhibited suspicious behavior at the parking lot where the drug deal was purportedly set to take place. Furthermore, Servin's testimony (including his description of the car) and the phone calls between Servin and the defendants make it highly unlikely that this was simply a case of being in the wrong place at the wrong time, as appeared likely for Winton. The fact that Servin had told police that Cricket had "high hair" – in contrast to Rhaburn's actual hair style – does not outweigh the considerable evidence that indicates that Rhaburn was Cricket.

Thus, we believe that sufficient evidence exists to affirm the convictions of both Rhaburn and Simon.

---

[9]Only the presentence report specifically identifies Rhaburn as "Cricket."

# VII.

At trial, the prosecution attempted to strike one of the two African-Americans on the venire panel; Simon objected to this attempt to strike,[10] and the district court held a *Batson* hearing to determine whether the prosecution's actions were motivated by race. As a racially-neutral explanation of his decision to strike Mr. Hurst, an African-American panelist, the prosecutor made the following claim:

> The government believes that the more intelligent the juror is, the better they will see between good evidence and things that might divert their attention from the facts of guilt. We can't look at individuals and determine whether they are intelligent or not. All we can do is discern from their level of education what—the amount of schooling they have had and tell us about on the questionnaire, what employment they have, what their life situation is and the information that they provide in the courtroom in answering questions.

As the prosecution explained, the African-American prospective juror had only a high school diploma, along with a few additional classes he had taken at Sinclair, a local community college, and he had been laid off from his job as a factory worker. According to the prosecutor, this educational and vocational background reflected poorly on the prospective juror's intelligence, and thus, the prosecution claims, he was excluded on the basis of intelligence rather than race.

Although the district court questioned the prosecutor's claimed rationale for excluding the African-American, it ultimately concluded that the prosecutor was acting in good faith when he asserted that the prospective juror was struck because of a perceived lack of intelligence, as opposed to his race. In so holding, the court offered two reasons in support of its conclusion that the black prospective juror was not excluded for racially motivated reasons: the prosecutor stated that he would not strike the last remaining African-American from the venire panel, and the prosecutor had previously struck several white jurors who also had only a high school education. Importantly, however, "the presence of one African-American on the jury does not preclude a *Batson* challenge." *United States v. Harris*, 192 F.3d 580, 587 (6th Cir. 1999). Moreover, in comparing the excluded African-American panelist to other excluded potential jurors, the district court misapplied the controlling legal standard.

*Batson* requires a judge to conduct a multi-step inquiry when a claim of racially biased jury selection is raised. First, the defendant must show that "he is a member of a cognizable racial group, [] that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race," and that the circumstances of the prosecutor's actions "raise an inference" that the peremptory challenges were motivated by the excluded juror's race. *Batson v. Kentucky*, 476 U.S. 79, 96 (1986) (internal citation omitted). Upon establishing these two prongs of the *Batson* inquiry, the defendant establishes a *prima facie* case of racial discrimination. *Id.* at 97.

The prosecution may overcome this *prima facie* case, however, by offering a "neutral explanation" for excluding the juror—that is, the prosecution must offer some explanation for its decision to exclude the juror other than a racial motivation. *Id.* Although this explanation need not be "particularly persuasive, or even plausible, so long as it is neutral," *Harris*, 192 F.3d at 586, the trial judge cannot simply accept the prosecution's explanation on its face. Rather, the trial judge has

---

[10]Of the four defendants in this case, only Simon raised a *Batson* challenge during jury selection, and only Simon renews that challenge in his brief on appeal. Accordingly, to the extent that a *Batson* violation also undermines Rhaburn's, Torres-Ramos', and Servin's convictions, those three defendants have waived their right to challenge their convictions on *Batson* grounds. *See United States v. Corrado*, 304 F.3d 593, 611 n. 12 (6th Cir. 2002) ("Arguments not developed in briefs on appeal are deemed waived by this court . . . .").

a duty to conduct a hearing to "determine if the defendant has established purposeful discrimination." *Batson*, 476 U.S. at 99. Moreover, in conducting this hearing, the trial judge must assess the plausibility of the prosecution's proffered explanation "in light of all evidence with a bearing on it." *Miller-El v. Dretke*, 545 U.S. 231, 251–52 (2005).

It is well established that a *Batson* violation may be shown by disparate treatment of white and minority jurors—that is, if a "side-by-side comparisons of some black [potential jurors] who were struck and white ones who were not" shows that the only material distinction between the removed black and the retained white individuals is their race. *Id.* at 241. Thus, in *Miller-El v. Dretke*, the prosecution claimed that it excluded African-American potential jurors from a jury panel because they expressed reservations about imposing the death penalty. In holding that the prosecution's asserted reason for excluding these prospective jurors was pretextual, the Supreme Court relied heavily on the fact that, although one of the excluded African-Americans had expressed concerns about applying the death penalty to persons who could be rehabilitated, several non-black jurors had expressed similar concerns, yet had not been excluded. *Id.* at 244–45. Similarly, in *United States v. Odeneal*, 517 F.3d 406 (6th Cir. 2008), a prosecutor excluded an African-American from the jury, claiming that she was excluded because she had previously sat on a jury that returned a verdict of acquittal. *Id.* at 420. The prosecutor, however, did not exclude a white person who had also sat on the exact same jury. *Id.* In light of this discrepancy, we held that such "unexplained disparate treatment established that the prosecutor's explanation was pretextual," and therefore was alone sufficient to establish a *Batson* violation. *Id.*

It is worth noting that, to prove disparate treatment in jury selection, it is not necessary to show that the excluded venire panelist was similarly situated to a white potential juror in all respects. *See id.* Indeed, a "*per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters." *Miller-El*, 545 U.S. at 247 n.6. Thus, in *Miller-El*, an African-American who expressed particular views about the death penalty also had a brother who had previously been convicted of a crime. Although the prosecution referred to both the prospective juror's views and his brother's conviction as race-neutral reasons for excluding him, the Supreme Court nonetheless found the prospective juror to be similarly situated to white potential jurors who expressed the same views of the death penalty yet were allowed to remain on the jury. *Id.* at 246–47.

In the instant case, rather than engaging in "side-by-side comparisons of some black venire panelists who were struck and white ones who were not," *id.* at 241, the district court compared the excluded African-American to other, white panelists who had also been excluded. In other words, rather than asking whether similarly situated people were treated differently, the district court instead searched for similarly situated people who were treated the same. This kind of inquiry, which seeks similarity and ignores differences, is not what the Equal Protection Clause requires. *See Club Italia Soccer & Sports Org., Inc. v. Charter Tp. of Shelby,* 470 F.3d 286, 298 (6th Cir. 2006) (holding that the Equal Protection Clause protects against state action that treats one person "disparately as compared to similarly situated persons"). The district court should not have allowed the prosecution to exclude an African-American merely because that panelist resembled some other excluded panelist; rather the district court's duty was to compare the excluded potential juror to other persons who were *not* excluded by the prosecution. *See Miller-El*, 545 U.S. at 244; *Odeneal*, 517 F.3d at 420.

Based on the record that we initially obtained from the district court, it was unclear whether the district court possessed any information indicating that jurors similarly situated to Mr. Hurst were empaneled. Nevertheless, the Supreme Court commands that district courts must conduct a *Batson* inquiry "in light of all evidence with a bearing on it." *Miller-El*, 545 U.S. at 251-52. We believe that this command places an affirmative duty on the district court to examine relevant evidence that is easily available to a trial judge before ruling on a *Batson* challenge. In light of the

government's proffered rationale in the case before us, that would include examining the juror questionnaires. Accordingly, in reviewing the district court's rejection of Simon's *Batson* challenge, we contacted the district court clerk's office *sua sponte* and located the juror questionnaires, which included the responses of three white individuals who were empaneled on the jury and whose educational and employment histories were similar to Mr. Hurst's.[11] According to the Federal Rules of Evidence we may take judicial notice of "adjudicative facts" that are "not subject to reasonable dispute" because they are either "generally known" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201. The rule also affords us the ability to take judicial notice of such facts *sua sponte*. FED. R. EVID. 201(c) ("A court may take judicial notice, whether requested or not."); *see also United States v. Harris*, 331 F.2d 600, 601 (6th Cir. 1964) (explaining that a court may take judicial notice *sua sponte*). Because the accuracy of juror questionnaires cannot reasonably be questioned, we take judicial notice of the three juror questionnaires and remand to the district court to determine whether, in light of the three questionnaires and further development of the record by the parties,[12] the third step of the *Batson* inquiry is satisfied. In making this determination, the court should compare the excluded potential juror to other jurors who were *not* excluded by the prosecution.

## VIII.

For the foregoing reasons, we AFFIRM the judgment of the district court with respect to defendants Torres-Ramos, Servin, and Rhaburn, and REMAND the issue of whether, in light of the additional evidence, Simon's *Batson* challenge requires that his conviction be reversed.

---

[11]For example, each of the three jurors only possessed a high school degree. While each juror did indicate some form of employment, we leave it to the district court to determine whether this employment sufficiently distinguishes the jurors from Mr. Hurst so as to satisfy the *Batson* inquiry.

[12]We emphasize that under *Batson*'s three-part framework, the burden of proving pretext falls on the defendant and not on the district court judge. Nevertheless, this burden of proof does not absolve the district court of its duty to consider a *Batson* challenge "in light of all evidence with a bearing on it." *Miller-El*, 545 U.S. at 251-52.