NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0593n.06

Nos. 09-5069 and 09-5241

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Sep 02, 2010
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF KENTUCKY |
| OLIMPIA GASPAR,    (09-5069) | ) | |
| JAVIER GASPAR,    (09-5241) | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

Before: GIBBONS and COOK, Circuit Judges; and VAN TATENHOVE, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** Defendants–appellants Javier and Olimpia Gaspar (collectively "the defendants") appeal their convictions for aiding and abetting the distribution of over five grams of cocaine base in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B), and 18 U.S.C. § 2. They argue that the government presented insufficient evidence to sustain their convictions and that the district court erred when it denied their motions for judgments of acquittal. In addition, Olimpia Gaspar challenges the district court's denial of her motion for a mistrial based on the testimony of a government witness regarding her prior bad acts. For the reasons that follow, we affirm the judgment of the district court.

---

[*]The Honorable Gregory F. Van Tatenhove, United States District Judge for the Eastern District of Kentucky, sitting by designation.

**I.**

This case concerns a Bowling Green, Kentucky, drug transaction. From March to June of 2006, Special Agent David Hayes of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") in Bowling Green, confidential informant Laura Chapman, and another undercover officer made several controlled purchases of cocaine base from Cesar Gaspar, also known as Cecil.[1] They also purchased from Cecil's wife, Margarita Gaspar, and Margarita's brother, David Puga-Rios. An individual named Larry Larue was the Gaspars's source for the drugs. On May 18, 2006, Hayes and Chapman, posing as crack resellers from Indianapolis, arranged to purchase two ounces of cocaine base from Cecil at Puga-Rios's home at 4 Walker Court ("No. 4" or "Walker Court"). Another undercover agent, Special Agent Wayne Kilday of the Nashville ATF office, accompanied them. The buy was electronically monitored. Chapman carried a camera mounted on her purse and Hayes wore a microphone; the audio and visual evidence was introduced at trial.

When Chapman, Hayes, and Kilday arrived at Walker Court, Hayes told Cecil that their previous transaction had been short four or five grams, and the two agreed on a price of $1,400 per ounce. Cecil, however, did not have drugs in his physical possession at the time. He told Hayes that he would retrieve the drugs from Larue but demanded payment upfront. Hayes then paid Cecil $2,800 on the condition that Cecil personally bring the crack back to Walker Court. At trial, Chapman testified that Cecil seemed "skeptical" during this conversation because Kilday had not previously participated in the drug buys.

---

[1]In order to avoid confusion, we hereinafter refer to the members of the Gaspar family by their first names.

While Hayes and Cecil were negotiating prices, Cecil's brother, defendant Javier Gaspar, arrived at Walker Court. After Cecil left, Hayes, Chapman, and Kilday joined Javier and several other people around a neighborhood bonfire. During the approximately one and a half hours that they waited for the cocaine, Hayes engaged Javier in conversation. They discussed the drug situation in Bowling Green, and Hayes commented that Cecil had good drugs. Javier agreed that his brother had "good shit." Javier also said to Hayes, "[M]y brother helps you make money." Finally, when Hayes mentioned to Javier that the previous transaction had been short, Javier replied, "No, my brother [would] not do that." When Hayes asked Javier when Cecil would return, Javier told him, "He's real close," and mentioned that Cecil was waiting for a set of digital scales to weigh the drugs.

Javier then received a phone call from Cecil. "Immediately after that," Olimpia Gaspar, the sister of Cecil and Javier, arrived at Walker Court. Aside from her two young children, Olimpia was the only person inside her car. Chapman testified that she saw Puga-Rios approach Olimpia's car and retrieve something from inside. Puga-Rios and Hayes then entered 4 Walker Court and Puga-Rios gave Hayes a baggie containing crack cocaine. Because the previous transaction was short, Hayes wanted to weigh the drugs. As Hayes placed a set of digital scales on the hood of his car, Javier approached Hayes and asked, "Is there a problem? What's going on?" Hayes showed Javier the weight to indicate that the amount was correct, then asked where Cecil was and why he did not return to Walker Court. Javier replied that Cecil was wary of Kilday and so had sent the drugs with someone else.[2] The transaction thus concluded.

---

[2]There is some discrepancy in the witness testimony about when this information was relayed. According to Hayes, Javier told him why Cecil was not coming back after Hayes had weighed the drugs. Chapman, however, testified that Javier volunteered the information after

In February 2008, a grand jury returned an indictment against Cecil, Margarita, Olimpia, Javier, Puga-Rios, and Larue. Javier and Olimpia were charged with aiding and abetting the distribution of over five grams of crack cocaine on May 18, 2006, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) and 18 U.S.C. § 2. At trial, defense counsel asked Chapman how she knew what Olimpia had handed to Puga-Rios. Chapman testified that she knew it was cocaine because she previously had purchased drugs from Olimpia. Defense counsel moved for a mistrial, but the district court denied the motion and instructed the jury to disregard the reference to prior drug transactions. At the close of the government's case-in-chief, the defendants moved for judgments of acquittal based on insufficiency of the evidence. The district court denied the motions, finding that "the evidence is not overwhelming, but . . . it's sufficient." The jury convicted the Gaspars. The defendants submitted written motions for judgments of acquittal, which the district court again denied. This appeal timely followed.

## II.

We review *de novo* a district court's sufficiency determination. *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002). "When deciding whether a conviction is supported by sufficient evidence, we determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Russell*, 595 F.3d 633, 644 (6th Cir. 2010) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (additional citation omitted). "To prove that [a defendant] aided and abetted drug transactions under 18 U.S.C. § 2, the government must establish that [he]

---

receiving the phone call from Cecil earlier in the evening.

4

participated in the venture as something he wished to bring about and sought to make succeed."
*United States v. Cecil*, — F.3d —, 2010 WL 3120027, at *12 (6th Cir. Aug. 10, 2010) (quoting
*United States v. Ward*, 190 F.3d 483, 487 (6th Cir. 1999)) (quotation marks omitted). All conflicts
in the testimony are resolved in favor of the government, and every reasonable inference is drawn
in its favor. *United States v. Bashaw*, 982 F.2d 168, 171 (6th Cir. 1992). Further, "[c]ircumstantial
evidence alone is sufficient to sustain a conviction and such evidence need not remove every
reasonable hypothesis except that of guilt." *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir.
1986). Thus, under this standard of review, a defendant "bears a very heavy burden." *United States
v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000).

**A.**

Javier claims that the government failed to present sufficient evidence that he aided and
abetted the drug transaction on May 18, 2006. He argues that he was merely present at the scene of
the crime and said nothing to Hayes to encourage or facilitate the transaction. Javier also contends
that the transaction was complete before he arrived at Walker Court. He points out that Hayes
testified that he would not have left Walker Court until he was in possession of the cocaine and
concludes that he could not have said anything to aid in the transaction. Finally, he argues that his
comments regarding Cecil's drug operations could not reasonably be construed as attempts to
encourage the drug deal because they were only in response to Hayes's questions.

"Although mere presence alone is insufficient to support a guilty verdict, presence is a
material and probative factor which the jury may consider in reaching its decision." *United States
v. Hodges*, 935 F.2d 766, 773 (6th Cir. 1991) (quoting *United States v. Christian*, 786 F.2d 203, 211

5

(6th Cir. 1986)) (quotation marks omitted). Further, "[a] defendant's guilty knowledge and voluntary participation may be inferred from surrounding circumstances." *Id.* (citation, emphasis, and quotation marks omitted); *see also United States v. Fisher*, 992 F.2d 1218, 1993 WL 100096, at * 3–4 (6th Cir. Apr. 5, 1993) (per curiam) (unpublished table opinion) (applying *Hodges* to a charge of aiding and abetting). Javier was more than merely present during the sale of cocaine at Walker Court. Rather, the evidence before the jury supported a finding that he was involved in and aided this particular drug transaction. There is evidence that Javier knew that Cecil was a drug dealer and knew that Hayes, in his undercover persona, was a buyer and reseller of Cecil's drugs. Javier's conversations with Hayes indicate that he knew about the specific drug deal that was occurring. The jury heard testimony that Javier made comments about his brother's drug operations, including references to the quality of the drugs and to Cecil's transactional honesty. There was also testimony that Javier explained the reasons for the delay in delivery of the drugs to Hayes, and, in stating that Cecil was "real close," sought to minimize concerns about the delay. Furthermore, there is evidence that Javier received a phone call from Cecil immediately before the drugs were delivered to Hayes. After the drugs were delivered, Javier approached while Hayes weighed the drugs and checked on the status of the transaction. Javier then indicated that he knew why Cecil did not personally return with the drugs, stating that Cecil was wary of the first-time presence of Kilday. Viewed in the light most favorable to the prosecution, these facts would allow a reasonable juror to conclude that Javier aided and abetted the distribution of drugs.

**B.**

Olimpia argues that the jury relied on speculation in convicting her because she was not found with drugs or drug money, nor was she seen participating in the transaction. She argues that her only suspect action was to be near the scene of the transaction and cites *United States v. Peters*, 15 F.3d 540, 544 (6th Cir. 1994), for the proposition that being in a common area near a quantity of drugs cannot alone support a conviction.

While simply being near a quantity of drugs may be, on its own, insufficient to support a conviction for aiding and abetting, we have held that the exhibition of suspicious behavior near the scene of a drug transaction can be sufficient circumstantial evidence to support such a conviction. *See United States v. Torres-Ramos*, 536 F.3d 542, 557 (6th Cir. 2008). Here, there is more than just suspicious behavior—there is evidence that Olimpia actively participated in the drug transaction. First, the drug transaction was not completed until Olimpia arrived at Walker Court. Because no drugs changed hands immediately upon Hayes's arrival at the residence, a juror could reasonably infer that initially there were no drugs there. This inference is strengthened by the fact that Cecil said that he would need to meet his supplier and his insistence on payment up front. Further, when Olimpia arrived, she was the only adult in the car. Puga-Rios retrieved something from the car, and the handover of the drugs took place immediately thereafter. From these facts, a rational juror likewise could infer that Olimpia delivered the drugs to Walker Court. Additionally, Olimpia arrived immediately after Javier spoke with Cecil on the phone. A reasonable juror could conclude that Cecil phoned Javier to alert him that the drugs were *en route* and that Olimpia would deliver them. It is therefore unlikely that Olimpia was simply "in the wrong place at the wrong time." *Id.* at 558.

7

Drawing inferences from the evidence presented in the light most favorable to the prosecution, there was sufficient evidence to conclude that Olimpia aided and abetted the distribution of crack cocaine by delivering the drugs.

Viewed as a whole, the evidence against each defendant was sufficient for a rational juror to find all of the elements of aiding and abetting beyond a reasonable doubt. The district court's denial of Javier and Olimpia Gaspar's acquittal motions was therefore without error.

### III.

"We review a district court's denial of a motion for mistrial under the abuse-of-discretion standard." *United States v. Wimbley*, 553 F.3d 455, 460 (6th Cir. 2009). In determining whether an improper reference warrants a mistrial, we consider five factors: "(1) whether the remark was unsolicited, (2) whether the . . . line of questioning was reasonable, (3) whether the limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant." *Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003). "The primary concern [in this inquiry] is fairness to the defendant." *United States v. Forrest*, 17 F.3d 916, 919 (6th Cir. 1994).

Olimpia claims that error tainted her trial when Chapman testified about past cocaine base transactions involving Olimpia. This argument focuses on the following exchange between defense counsel and Chapman:

Q. What did you actually see her deliver? Describe what you saw her—not what you saw Puga-Rios pull out of his pocket. Tell me exactly what you saw her hand to him.

A. I did not exactly see her hand it to him. I know she brought it over there to us.

8

Q. So you know—you don't know what she handed him, correct?

A. I'm very—I'm pretty clear of what she handed him because I've dealt with Olimpia before prior to all this with a friend, another friend, where she was selling crack cocaine out of her house.

Following a brief bench conference, the district court then issued the following admonition to the jury:

Ladies and gentlemen, there were just some statements that were made about something that may or may not have happened before this event. You're just to completely disregard that testimony. It was an unresponsive answer, and there's no corroborating testimony in that regard. Just completely disregard it. It was just volunteered.

Olimpia argues that Chapman deliberately interjected an unsolicited reference to Olimpia's past drug activity into her testimony and contends that the reference was particularly harmful in light of the fact that it constituted the only direct evidence that she may have been involved in distributing cocaine. Because Chapman was a paid government informant, Olimpia contends, she had an incentive to interject damaging testimony to ensure an outcome favorable to the prosecution. Finally, without offering any basis for her contention, she argues that the district court's instruction to the jury was ineffective.

Applying the relevant factors to the circumstances presented, the district court did not abuse its discretion in concluding that a mistrial was unwarranted. First, Chapman's remark was not unsolicited by defense counsel. Defense counsel, having asked Chapman once to describe what she saw, continued to press Chapman about how she knew what she saw. Describing what one has seen and how one knows what one has seen are different inquiries, and defense counsel's line of questioning invited Chapman's varying answers. Second, there does not appear to be anything

unreasonable about defense counsel's line of questioning. Defense counsel sought merely to cross-examine an eyewitness and, in so doing, elicited inadmissible information adverse to the defendant. Third, the district court issued an explicit admonition to the jury, repeating twice that it was to disregard Chapman's comment and highlighting that the comment was supported by "no corroborating testimony." The instruction was issued within minutes of the testimony, *cf. United States v. Wiedyk*, 71 F.3d 602, 608 n.2 (6th Cir. 1995) (finding instructions given seventy minutes after improper questioning sufficiently curative because, *inter alia*, they were clear and forceful), and "[j]uries are presumed to understand and follow such directions from the court," *Forrest*, 17 F.3d at 920–21. Finally, the jury heard testimony from other government witnesses about Olimpia's involvement in the events of May 18, 2006. In context, Chapman's testimony regarding Olimpia's prior drug dealings was a small part of the government's case, and there was sufficient evidence for the jury to convict Olimpia even in the absence of Chapman's extraneous comments. For these reasons, the district court acted well within its discretion in denying the motion for a mistrial.

## IV.

For the foregoing reasons, we affirm the judgment of the district court.