NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 15a0359n.06

Case Nos. 13-6413/6415

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
May 12, 2015
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,                )
                                         )
        Plaintiff-Appellee,              )
                                         )
v.                                       )    ON APPEAL FROM THE UNITED
                                         )    STATES DISTRICT COURT FOR
                                         )    THE EASTERN DISTRICT OF
MARCISO NAVA VALDEZ; JAIME               )    TENNESSEE
MANCILLA SOBERANIS,                      )
                                         )
        Defendants-Appellants.           )
                                         )

Before: SILER, MOORE, and STRANCH, Circuit Judges.

**SILER, Circuit Judge.** This is a consolidated appeal, in which a jury convicted

defendants Marciso Nava Valdez and Jaime Mancilla Soberanis[1] (collectively, the defendants) of

conspiring to distribute and to possess with intent to distribute at least five kilograms of cocaine,

in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. The defendants appeal the

sufficiency of the evidence to sustain their convictions. For the reasons explained below, we

**AFFIRM**.

**FACTUAL AND PROCEDURAL BACKGROUND**

In 2012, a confidential informant told Agent Rodd Watters of the Tennessee Bureau of

Investigation (TBI) about a group from Georgia, led by Leticia Gonzalez, who was interested in

buying cocaine.

_____

[1] The defendants' names are hyphenated in portions of the record but are not hyphenated in others.

**The August 24 Meeting**

On August 24, 2012 the confidential informant placed a call to a contact in Gonzalez's group, and the individual requested that the confidential informant and Gonzalez meet. Agent Watters arranged a meeting that same day at a Cracker Barrel restaurant in East Ridge, Tennessee.

Gonzalez met with the confidential informant on the front porch of the Cracker Barrel to discuss the sale of large quantities of cocaine. Co-defendant Carl Hunt drove Gonzalez to the meeting in a silver Chevrolet Camaro. Hunt also took part in the meeting on the front porch. The confidential informant told Gonzalez about his source, who was in fact Agent Watters acting in the undercover capacity as a cocaine distributor. TBI surveillance at the Cracker Barrel did not reveal any countersurveillance by anyone associated with Gonzalez. Countersurveillance refers to the practice of following the buyer of illegal substances in order to protect the buyer and to locate any law enforcement in the area.

**The August 29 Meeting**

Agent Watters first met face-to-face with Gonzalez on August 29 at the East Ridge Cracker Barrel. The purpose of the meeting was for Agent Watters to sell nine kilograms of cocaine (an amount the group had previously requested) to the Gonzalez group.

Crosby Jones, an agent with the Drug Enforcement Agency, worked surveillance. Special Agent Jones was positioned in a parking lot across the street from the Cracker Barrel and was assigned to provide close cover to Agent Watters and to look for individuals that may have been conducting countersurveillance in the area. Jones witnessed Gonzalez's silver Camaro pull into an empty BB&T Bank parking lot, located "just down the street" from the Cracker Barrel. Shortly thereafter, a red Toyota Camry pulled in and "just sat there." The Camaro then drove

directly next to the Camry. Nobody exited the vehicles, but "it appeared as though they were having a conversation, being parked that closely."

The Camaro exited the BB&T parking lot and drove to the Cracker Barrel. Then the Camry drove to a mini mall near to where Agent Jones was parked, and after a few minutes, the Camry pulled into the Cracker Barrel parking lot. Gonzalez exited the passenger side of the Camaro and walked toward the front porch of the Cracker Barrel to meet with the informant. Meanwhile, J.J. Higgins, the driver of the Camaro, remained in the Camaro. Soberanis exited the back passenger side of the Camry and entered the passenger side of the Camaro. Jones observed that two individuals remained in the Camry: an unidentified driver and Valdez. After Soberanis got out of the Camry, it drove back to the parking lot closer to Agent Jones. When Soberanis walked back to the Camry from the Camaro, "he had a cell phone in his hand with an earplug" in his ear.

Gonzalez met the informant on the front porch of the Cracker Barrel. Watters then arrived, and the informant introduced him to Gonzalez as the source. Watters and Gonzalez discussed whether Gonzalez was ready to purchase nine kilograms of cocaine. At one point, Gonzalez called someone on her cellphone and said in Spanish, "Tell J.J. to come here, please." At trial, the government argued that she was calling Soberanis, who was identified as being in the Camaro with Higgins around the same time Gonzalez placed the call. Gonzalez eventually reneged on the original agreement to purchase nine kilograms of cocaine and instead sought to purchase just one kilogram "so her guy could test it." Gonzalez and Agent Watters could not reach a deal.

After the failed meeting, Agent James Hixson followed the Camaro to a gas station, where the Camry pulled in alongside the Camaro. The parties "appeared to be involved in

conversation." Agents followed the Camry from the gas station to an apartment complex in Georgia. Agent Sammy McNelly observed as three Hispanic males exited the Camry and stood around a black truck at the complex. A Hispanic male wearing a white t-shirt exited from the Camry and walked away from the group while he was on the phone. The Hispanic male in the white shirt and a Hispanic male that had exited the Camry wearing a striped shirt left in the truck. Testimony of various agents implied that the two males were Soberanis and Valdez based on the description of the clothing associated with each of the defendants as they were identified earlier that day.

### September 6 Meeting

On September 6, Agent Watters again met with Gonzalez at a different Cracker Barrel in Tiftonia to "flash her 5 kilograms of cocaine." Agent Watters succeeded at showing Gonzalez and her son the cocaine located in the trunk of a car. Gonzalez said, "That's exactly how we want it," and the parties began negotiating whether she could take five kilograms. Agents at the scene did not detect any countersurveillance, nor did they see the red Camry.

### September 10 Meeting

Agent Watters and Gonzalez arranged to meet on September 10 in order for Gonzalez to purchase four kilograms of cocaine. Shortly after making the deal over the phone, Gonzalez called back and asked to reduce the amount to three kilograms of cocaine because "one of her guys had not come through with their money." Agent Watters met Gonzalez and Gonzalez's son on the front porch of the Tiftonia Cracker Barrel. When Watters approached them, he told Gonzalez that she was killing him with the delays and remarked that she was late. She apologized and indicated that "the other car that was with her was driving slow and taking their time and she was having to tell them where to go and it would not happen again this way."

Watters asked, "We still waiting on somebody? . . . What, is he driving like a lil' granny?" Gonzalez answered "Yes!" Gonzalez's son also affirmed that Gonzalez was having troubles with the "other driver." Gonzalez was on the phone speaking in Spanish, and then announced, "He's here, the guy." A short time later, Watters asked, "Is [the guy] gonna take [the cocaine] back with you?" Gonzalez responded in Spanish, "Si. [yes]."

When Gonzalez, Watters, and Gonzalez's son walked from the front porch to the Camaro, Watters noticed the same red Camry that had been at the August 29 meeting parked just "two spots away from" the Camaro; the Camry had not been present when Gonzalez arrived. Soberanis exited the passenger side of the Camry and appeared to begin approaching Watters, and Watters asked Gonzalez if she knew him. Gonzalez said something to Soberanis in Spanish, and he returned to the passenger seat of the Camry but left the passenger door ajar. Gonzalez and Watters walked to the Camaro where Gonzalez remarked that Watters "looked hungry." The $75,000 was in a Capri Sun box in the back floorboard of the Camaro, and Watters flipped through the cash while sitting in the Camaro. Watters asked if Gonzalez wanted the cocaine in the Camry, and she indicated that she did. Watters called another agent on the phone to ask him to bring the cocaine and directed the agent to, "Just pull up behind . . . this red one here. We can trade, we can put it in the trunk. Alright?"

This was the signal for the takedown, and the agents arrested Gonzalez, Gonzalez's son, Valdez, and Soberanis. Valdez was in the driver's seat of the Camry, and Soberanis was in the passenger's seat. The agents recovered a cell phone in the Camry. After searching the phone, the agents discovered that Gonzalez's number was programed in the phone under the name "la doña," "La doña" is a Spanish term of respect for a woman in "a higher position of authority."

A grand jury indicted Gonzalez, Valdez, Soberanis, Higgins, and Hunt for conspiring to distribute and to possess with the intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Gonzalez, Higgins, and Hunt pleaded guilty to the conspiracy count. A jury convicted Valdez and Soberanis. Valdez and Soberanis each appeal the denial of their Fed. R. Crim. P. 29 motion for judgment of acquittal.

## STANDARD OF REVIEW

"This Court reviews a 'challenge to the sufficiency of the evidence by considering the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.'" *United States v. Blackwell*, 459 F.3d 739, 760 (6th Cir. 2006) (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)).

## ANALYSIS

"To prove a conspiracy under 21 U.S.C. § 846, the government was required to prove, beyond a reasonable doubt, (1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy." *United States v. Pritchett*, 749 F.3d 417, 431 (6th Cir. 2014) (internal quotation marks omitted). "The existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005) (internal quotation marks omitted). Once the government establishes a conspiracy beyond a reasonable doubt, "a defendant's connection to the conspiracy need only be slight." *Id.* (internal quotation marks omitted).

Here, there is no question that a conspiracy existed. Gonzalez and other co-defendants pleaded guilty to the conspiracy. Moreover, the government produced an abundance of evidence

at trial that showed Gonzalez was not acting alone when she negotiated with Agent Watters to purchase large quantities of cocaine. The question is whether sufficient evidence establishes that Valdez and Soberanis had the knowledge and intent to join the conspiracy and whether sufficient evidence supports that they participated in the conspiracy.

Both Valdez and Soberanis argue that the evidence establishes only that they were present at two of the four meetings and that no more than speculation connects them to the conspiracy. We disagree.

**Valdez**

The government presented evidence to show that Valdez was present at the two meetings that were supposed to result in the purchase of large quantities of cocaine. Valdez was identified as being in the Camry on the August 29 meeting. The Camry was parked near the Camaro—which was associated with the leader of the conspiracy in this case, Gonzalez——at a BB&T Bank shortly before Gonzalez met with Agent Watters to negotiate a cocaine transaction. A reasonable juror could infer that the occupants of the Camry and the Camaro were communicating, since no other vehicles were located at the BB&T parking lot and the vehicles were parked closely together. Moreover, after the transaction failed, the same Camaro, associated with Gonzalez and the same Camry associated with Valdez stopped at a gas station where an agent saw a group of Hispanic individuals talking. A reasonable juror could infer that Valdez spoke with Gonzalez both before and after the August 29 failed meeting.

At the September 10 meeting, Valdez *drove* the Camry. Gonzalez told Agent Watters that she was late for the meeting because "the other car that was with her was driving slow and taking their time and she was having to tell them where to go and it would not happen again this way." When Agent Watters and Gonzalez walked toward Gonzalez's Camaro to retrieve the

$75,000 and to transfer the cocaine to the Gonzalez group, Gonzalez confirmed that she wanted the cocaine placed in the Camry. A reasonable juror could conclude that the "other car" that had caused Gonzalez to be late for the meeting was the Camry and that the driver who was driving like a "lil' grannie" was Valdez. A reasonable juror could conclude that Valdez planned to transport the cocaine back to Georgia in the Camry and took directions from Gonzalez. While it is *possible* that Valdez did not know that cocaine was going to be placed in the Camry he was driving, the circumstantial evidence makes that hypothesis unlikely. To sustain a conviction, we are not required to snuff out every reasonable hypothesis except that of guilt. *See Blackwell*, 459 F.3d at 760.

### Soberanis

Soberanis similarly was present at both meetings that were supposed to result in the purchase of large quantities of cocaine. He was in the Camry, which was seen parked closely to Gonzalez's Camaro shortly before the August 29 meeting. Unlike Valdez, however, Soberanis was directly linked to the driver of the Camaro, Higgins, who ultimately pleaded guilty to the conspiracy count in this case. At the August 29 meeting, Soberanis exited the Camry and went to the Camaro where Higgins was seated in the driver's seat. Agents also observed that Soberanis appeared to be on the phone and with Higgins (J.J.) around the same time that Gonzalez phoned someone and said, "Tell J.J. to come here, please." Agents followed the Camry and the Camaro to a gas station after the failed August 29 meeting and observed a group of Hispanic individuals conversing. A reasonable juror could infer that Soberanis was involved in the August 29 meeting.

Soberanis was the passenger in the Camry that was supposed to transport cocaine at the September 10 meeting. He also attempted to exit the vehicle and possibly approach Agent Watters, but he obeyed whatever Gonzalez said to him in Spanish and returned to the Camry.

Government agents testified that they believed the defendants were either conducting countersurveillance, were supposed to provide money for the exchange, or were designated to be the transporters of the drugs. Any of these activities is sufficient to support participation in the conspiracy.

Soberanis and Valdez argue that they were only present for fifty percent of the meetings that took place, but a conviction under § 846 does not require proof of involvement in every facet of the conspiracy. *See United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997) ("The government need not show that a defendant participated in all aspects of the conspiracy; it need only prove that the defendant was a party to the general conspiratorial agreement."). Indeed, the fact that the defendants were only present during the two meetings that were supposed to result in the actual purchase of cocaine makes the case against them even more compelling. This fact and the other evidence against the defendants renders it "highly unlikely that this was simply a case of being in the wrong place at the wrong time." *United States v. Torres-Ramos*, 536 F.3d 542, 558 (6th Cir. 2008).

Similarly to the case at hand, in *Torres-Ramos* we affirmed a conviction of two defendants who appealed their conviction by challenging the sufficiency of the evidence as to their knowing participation in a drug conspiracy. *Id.* at 556–59. The government produced the following evidence: other co-defendants had transported cocaine with the intent to distribute; previous cocaine deliveries had been made to a man named "Cricket" who drove an Oldsmobile; the defendants were spotted driving an Oldsmobile matching the description of Cricket's

Oldsmobile; the defendants behaved strangely near the location of a scheduled drug delivery; the defendants were directly connected to a co-defendant whose fingerprints were found on the drugs; and phone records connected the defendants to co-defendants on the day of their arrest. *Id.* at 557. We distinguished the facts in *Torres-Ramos* from other cases in which we have reversed a conviction by emphasizing:

> the defendants in the instant case exhibited suspicious behavior at the parking lot where the drug deal was purportedly set to take place . . . and phone calls between [the defendant in question] and the [other] defendants make it highly unlikely that this was simply a case of being in the wrong place at the wrong time . . . .

*Id.* at 557–58. Notably, the only evidence in *Torres-Ramos* that linked the defendants specifically to their knowledge of the object of the conspiracy—which was to distribute cocaine––was that a co-defendant said that he had delivered cocaine to "Cricket" in the past and was going to deliver cocaine to him again in the parking lot where the defendants arrived in a vehicle matching the description of Cricket's vehicle.

The defendants cite *United States v. Sliwo*, 620 F.3d 630 (6th Cir. 2010), in support of their position. In *Sliwo*, we overturned a conviction because "participation in a scheme whose ultimate purpose a defendant does not know is insufficient to sustain a conspiracy conviction under 21 U.S.C. § 846." *Id.* at 633. The government presented the following evidence: the defendant was linked to his alleged co-conspirators, who personally observed the loading of 900 pounds of marijuana into a van; the defendant arranged to transport the van before it was loaded with drugs; and the defendant served as lookout on three separate occasions. *Id.*

Evidence that was lacking in *Sliwo* is present in this case. For example, in *Sliwo* we reasoned that the "government failed to provide any evidence of any observed conversations between Defendant and his alleged co-conspirators." *Id.* By contrast, a reasonable juror could

conclude that Soberanis spoke directly to Higgins in the Camaro at the August 29 meeting and could also reasonably conclude that Soberanis spoke with Gonzalez over the phone directly at the same August 29 meeting. Gonzalez also spoke to Soberanis just before the take-down at the September 10 meeting. While Valdez's connection is a closer call, a jury could reasonably conclude that Gonzalez spoke with Valdez during the trip from Georgia to the Chattanooga area on the September 10 meeting, since Gonzalez's "guy" needed directions. A jury could also reasonably conclude that Valdez spoke with co-defendants before and after the August 29 meeting. Moreover, agents repeatedly observed Valdez with Soberanis, whom the jury also convicted in this case. Finally, the cell phone in the Camry connected the defendants to Gonzalez, specifically as a woman of authority.

In *Sliwo* we also emphasized that "the government can point to no evidence that links Defendant to marijuana, the essential object of the conspiracy." *Id.* at 634 (internal quotation marks omitted). But here, the defendants were present on both occasions where the Gonzalez group intended to purchase cocaine. The defendants also behaved suspiciously at the August 29 meeting by moving their vehicle to various locations around the Cracker Barrel before ultimately parking at the Cracker Barrel. At the September 10 meeting the defendants were present to transport the cocaine, which is in contrast to the defendant in *Sliwo*, who merely served as a lookout. Although the defendants in this case did not pop the trunk, and the cocaine was never placed in the trunk of the Camry, a reasonable juror could conclude that Valdez and Soberanis knew and believed that the cocaine was going to be placed in the trunk of their Camry.

In sum, circumstantial evidence of a defendant's knowledge of the specific object of the conspiracy is sufficient to sustain a conviction. *See Blumenthal v. United States*, 332 U.S. 539, 557 (1947) ("[T]he law rightly gives room for allowing the conviction of those discovered upon

showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others."); *Glasser v. United States*, 315 U.S. 60, 80 (1942) ("Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a development and collocation of circumstances" (internal quotation marks omitted)); *Torres-Ramos*, 536 F.3d at 556 ("[A] defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence of a common plan.").

While the evidence presented "is not of the smoking-gun variety, '[i]nferential proof may be controlling where the offense charged is so inherently secretive in nature as to permit the marshaling of only circumstantial evidence. This is the norm in drug conspiracy prosecutions . . . .'" *United States v. Carrillo-Alvarado*, 558 F. App'x 536, 546 (6th Cir. 2014) (quoting *United States v. Pelfrey*, 822 F.2d 628, 632 (6th Cir. 1987)).

**AFFIRMED**.