NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0633n.06

No. 16-6599/6606/6612/6624

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Nov 15, 2017 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Eastern |
| EZEQUIEL ARIAS OROZCO, JOSE | ) | District of Kentucky |
| GUERRA-GUTIERREZ, ISAI | ) | |
| PEDRAZA, and JUAN AVILA, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

**BEFORE:  GUY, MOORE, and ROGERS, Circuit Judges.**

**RALPH B. GUY, JR., Circuit Judge.**  A jury convicted the four codefendants of conspiring to distribute cocaine.  One defendant, Isai Pedraza, also was convicted of money laundering, conspiracy to commit promotional money laundering, and possession of a machine gun.  Defendants appeal certain of the district judge's evidentiary rulings, the sufficiency of the evidence, and the sentences imposed by the district judge.  We **AFFIRM**.

**I.**

In mid-2015, agents with the Drug Enforcement Agency and the Bureau of Alcohol, Tobacco, and Firearms began investigating Isai Pedraza for drug trafficking.

The investigation of Pedraza was a "spinoff" of a prior investigation of a larger scope.

Starting in September 2015, acting pursuant to a wiretap authorization, agents intercepted a series of phone calls between Pedraza and an individual who had a Mexican phone number. Pedraza and the individual discussed waiting for a call from an individual they called "the Volunteer." A call came to Pedraza on October 6, 2015, during which Gilberto Garza Solis said he was "calling on behalf of the Volunteer" to arrange a meeting in Lexington, Kentucky. The meeting occurred, and agents surveilling Pedraza observed his blue minivan park next to an orange tractor-trailer at the meeting site. After the meeting, investigators stopped the orange tractor-trailer, which Solis was driving, and seized $312,000 in U.S. currency hidden inside the vehicle.

On November 10, Pedraza spoke to the same individual with a Mexican phone number about "28 pieces," referring to 28 kilograms of cocaine, for which Pedraza had "preference" as a distributor. Pedraza opted to take all 28 kilograms for resale. The individual told Pedraza to expect a call from "Ezequiel," who would identify himself as "el licenciado," or "the lawyer." A man, later identified as defendant Ezequiel Orozco, called Pedraza on November 18, 2015, identified himself as "el licenciado," and stated that "the snow is wanting to arrive." At that time, Orozco was traveling in a tractor-trailer along with co-defendants Juan Carlos Avila and Jose Guerra-Gutierrez. Orozco and Pedraza arranged to meet the following day.

On that date, agents observed a tractor-trailer arrive at the agreed-upon meeting place. Shortly thereafter the same blue minivan, previously seen occupied by Pedraza, arrived. Alfredo Garcia Albores was observed exiting the minivan, and Gutierrez exited

the tractor-trailer cab carrying three bags that he handed to Albores. Subsequently, Pedraza received a call from Orozco informing him that Albores "took the furniture . . . the chairs as well."

After the exchange, law enforcement officers conducted a traffic stop on the minivan and recovered 28 kilograms of cocaine. The cocaine was vacuum-sealed to hide its odor and stored in three black trash bags, which were further concealed in the "decorative" department store shopping bags that Gutierrez was observed handing to Albores.

The tractor-trailer was also stopped after the exchange. At the time of the stop, Gutierrez was driving, Orozco was seated in the passenger seat, and Avila was in the truck's sleeper berth. A drug dog alerted to Avila's wallet. During a second search, a small bag of cocaine was found in an overhead compartment inside the passenger area of the truck.

Also seized from the truck were logs kept by Avila and Gutierrez. Both logs omitted an unscheduled stop made in Chicago the night before. Additionally, Avila's log indicated that they had arrived in Lexington, Kentucky on November 18, even though GPS data indicated that the truck was still in or around Chicago, Illinois, at that time. This inaccuracy had the effect of concealing the Chicago detour.

## II.

### A. Sufficiency of the Evidence (Orozco and Avila)

We review the sufficiency of the evidence for a conviction "in the light most favorable to the prosecution" to determine whether "*any* rational trier of fact could have

found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Circumstantial evidence, if "substantial and competent," may sustain a conviction even if no direct evidence exists. *United States v. Tarwater*, 308 F.3d 494, 504 (6th Cir. 2002).

To support a finding that Orozco or Avila were guilty of conspiracy under 21 U.S.C. § 846, the government had to prove three elements: that there was an agreement to violate federal narcotics laws, that the defendant knew of and intentionally joined the conspiracy, and that he participated in the conspiracy. *United States v. Guzman*, 677 F. App'x 221, 223 (6th Cir. 2017) (citing *United States v. Sliwo*, 620 F.3d 630, 633 (6th Cir. 2010)). "This Court has repeatedly held that participation in a scheme whose ultimate purpose a defendant does not know is insufficient to sustain a conspiracy conviction under 21 U.S.C. § 846." *Sliwo*, 620 F.3d at 633. Charges of conspiracy, including the elements of a defendant's knowledge and intent, "are not to be made out by piling inference upon inference." *Id.* at 638 (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943)). However, "[o]nce evidence of a conspiracy has been established, a defendant's connection to that conspiracy need only be slight." *United States v. Ayoub*, No. 15-1712, 2017 WL 2838331, at *13, ___ F. App'x ___ (6th Cir. July 3, 2017). "Membership and participation can be inferred through a defendant's actions and reactions to circumstances." *Id.*

Orozco and Avila maintain that they were simply completing a side job, the purpose of which was to deliver the sealed bags, and that they did not know that the bags

contained drugs. Both assert that all of the evidence the government submitted to the jury is consistent with their innocent explanation. But the record belies these claims.

There was significant circumstantial evidence sufficient to undermine Orozco and Avila's contention that they lacked knowledge of the conspiracy and to permit a jury finding of guilt. The evidence showed that after delivering the bags, Orozco phoned Pedraza to tell him that his "furniture" and "chairs" were delivered, even though the bags obviously could not have contained furniture. Orozco attempted to explain this to the jury by stating that he always used the word "furniture" to describe literally any kind of delivery, including "books or . . . anything else." The government also recorded Orozco telling Pedraza that "snow" — a common colloquialism for cocaine — was on its way. Although Orozco claimed that he was talking about the weather, the context of the call leaves the reasonable juror free to conclude that the reference to "snow" was actually a reference to cocaine.

Other evidence also supports Orozco's participation in the conspiracy. Orozco could not explain the defendants' unapproved, unlogged detour to Chicago. Orozco attempted to explain the detour by claiming that the truck had to stop in Chicago to pick up "paperwork" that had been left on a parking lot corner "far away . . . in a shadow." The jury was entitled not only to disbelieve such testimony, but also to infer that this testimony was an attempt to cover up the charged crime. *See, e.g.*, *United States v.*

*Seltzer*, 794 F.2d 1114, 1119 (6th Cir. 1986) (holding that the "incredible nature" of a defendant's testimony can support a jury's finding of guilt).[1]

Avila, in seeking reversal, relies on *Sliwo* and *United States v. Coppin*, 1 F. App'x 283 (6th Cir. 2001). In *Sliwo*, officers observed the defendant acting as a "lookout" near properties where a drug transaction took place. The defendant never was seen in an area where drugs changed hands, nor was he seen in a vehicle that was transporting drugs. Although the evidence suggested that the defendant knowingly participated in a scheme with some sort of criminal purpose, we reversed the conviction because there was no evidence that the defendant knew that the criminal purpose was to violate federal narcotics laws. *Id.* at 636-37.

Similarly, in *Coppin*, the defendant was convicted based upon evidence of phone calls between his phone and that of a drug supplier. There was no evidence that the defendant was party to the phone calls, and there was evidence that others had access to his phone. 1 F. App'x at 292. Additionally, there was evidence that the defendant was present when drug money, but not drugs themselves, had changed hands. An alleged co-conspirator testified, however, that the money was concealed, and that he believed that the defendant was merely present to help another co-conspirator who could not speak English. *Id.* As in *Sliwo*, we held that such evidence was insufficient for a rational juror

---

[1] Orozco's attempt to impeach the reliability of the interpreter of the wiretapped calls is without merit. Orozco does not settle on a particular line of attack, alternating between implications that (i) it was someone else's voice in the calls; and (ii) the calls themselves were inaccurately translated. Orozco never identifies any allegedly inaccurate translation, nor does he claim that it was not his voice in the recordings.

to find that the defendant acted with knowledge of a conspiracy to violate the narcotics laws.

Unlike the defendants in *Sliwo* and *Coppin*, Avila was physically present in the vehicle that transported the cocaine. "Evidence connecting a defendant to the location where drugs are sold is . . . probative of his involvement." *Ayoub*, 2017 WL 2838331, at *13; *see also Sliwo*, 620 F.3d at 637 n.5 ("[I]f Defendant had entered the van after the marijuana were loaded, even though the boxes were all closed, the conviction may have been affirmed."). And even though the drugs were concealed by vacuum-sealing and opaque packaging, other circumstantial evidence would permit a reasonable jury to conclude that Avila knew that the purpose of the conspiracy was to violate the federal narcotics laws: the presence of unconcealed cocaine within the truck cab, to which Avila had access; and the presence of a narcotic odor on Avila's wallet to which the drug dog alerted. A rational jury could conclude that the combination of the narcotic odor, which was specific to Avila only, and the cocaine in the truck sufficed as evidence of Avila's knowing participation in a cocaine-distribution conspiracy. Finally, whereas in *Sliwo* we observed that the "government failed to provide any evidence of any observed conversation between Defendant and his alleged co-conspirators," 620 F.3d at 633, Avila traveled cross-country in close quarters with Gutierrez and Orozco, during which Orozco made phone calls in which he referenced cocaine. Avila took steps to conceal the Chicago detour in his log, and Gutierrez's log mirrored this concealment. These facts entitled the jury to believe that Avila was conferring with his co-conspirators about the conspiracy. *See also United States v. Valdez*, 611 F. App'x 330, 336-37 (6th Cir. 2015).

Viewing the evidence in the light most favorable to the prosecution, *see United States v. Garcia*, 758 F.3d 714, 719 (6th Cir. 2014), there was sufficient evidence to sustain Avila's conspiracy conviction.

B. **Motion to Suppress (Pedraza)**

Pedraza argues that evidence gathered pursuant to a wiretap should have been excluded. "In reviewing the validity of an electronic surveillance order, we will accord great deference to the determinations of the issuing judge." *United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) (quotation marks omitted). "Thus, the fact that a . . . reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant." *Id.* (quoting *United States v. Alfano*, 838 F.2d 158, 162 (6th Cir. 1988)).

Pedraza argues that the application for the wiretap did not meet the statutory "necessity" requirement, 18 U.S.C. § 2518(1)(c). Under 18 U.S.C. § 2518(1)(c), each application for a wiretap "shall" include, among other things, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." The necessity requirement found in § 2518(1)(c) is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). Pedraza challenges the government's wiretap application on four grounds related to that principle: (1) traditional investigative techniques had been yielding "relatively quick and substantial progress"; (2) the period during which traditional investigative techniques were employed

was "too abbreviated," lasting only about two months; (3) the government's wiretap application employed a non-chronological narrative designed to obscure the brevity and significant achievements of traditional investigative techniques; and (4) the government failed to claim that further use of traditional investigative techniques would be "futile," instead claiming only that achieving further goals of the investigation without a wiretap would be "unlikely." In his reply brief, Pedraza further claims that the government's wiretap application improperly reframed the inherent limitations of certain investigative techniques as indicia of their futility in a specific case.

Even if the government's traditional investigative techniques yielded progress prior to the application, and even if that period was "abbreviated," these are of no moment. Neither of these claims is probative of whether the government's application was sufficient at the time it was made. *See also United States v. Stewart*, 306 F.3d 295, 305 (6th Cir. 2002) ("[T]he mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance."). And, regarding the non-chronological narrative in the government's application, the record reflects that the district court judge was not misled; in his order denying the suppression motion, Judge Reeves acknowledged the confusing nature of the narrative, but he indicated that he was able to parse out the relevant facts.

Pedraza's remaining claim, as supplemented in his reply brief, is that the application simply did not satisfy § 2518(1)(c)'s requirements because the government did not show that continued use of traditional investigative techniques would have been futile or unlikely to succeed. To the contrary, the government's application for a wiretap

was exhaustively supported, evidencing a thorough, quality investigation. Non-invasive techniques such as physical surveillance, trash searches, interviews with cooperating defendants, and pen registers were either conducted and exhausted or, based on Pedraza's "surveillance-conscious" nature, deemed too risky to continue without jeopardizing the investigation.

Pedraza argues that certain justifications for the wiretap, such as the inability of a pen register or visual surveillance to identify the contents of a conversation, merely stated the inherent limitations of traditional investigative techniques, and that consideration of those inherent limitations would make a nullity of § 2518(1)(c). As a whole, however, the application reflects that investigators were limited by case-specific factors such as Pedraza's surveillance-conscious nature and their objective of unraveling a particularly complex drug distribution conspiracy.

Pedraza relies on *United States v. Rice*, 478 F.3d 704 (6th Cir. 2007), but that case is distinguishable. The investigation in *Rice* was sparse, and the wiretap application contained inaccuracies and embellishments. For instance, the application there stated that "[p]hysical surveillance of the subjects of this investigation has been conducted . . . ," when, in fact, no surveillance of the defendant had occurred. *Id.* at 707. The application in *Rice* listed the traditional investigative techniques of trash pulls, a grand jury, and search warrants, but justified eschewing them by describing their inherent limitations in drug cases. *Id.* at 708. By contrast, here, search warrants and trash pulls were utilized, and the application explained why a grand jury would be counterproductive. And other techniques, apparently absent in *Rice*, were used here, such as financial investigations

and the use of information gathered from separate wiretap authorizations. The totality of the wiretap application reflects that the district court did not err in denying the motion to suppress.

### C.  Cross-Examination Regarding Polygraph Examination (Pedraza)

At trial, Albores testified pursuant to a plea agreement and directly implicated Pedraza in the conspiracy. Albores' plea agreement contained a provision requiring him to submit to a polygraph examination if the government requested one. The government never required Albores to submit to a polygraph examination, and Pedraza's counsel sought to elicit this fact on cross examination. The government objected, and the district judge sustained the objection on the basis that whether the government administered the polygraph was not relevant to Albores' credibility as a witness against Pedraza; rather, it was relevant only to whether the government believed Albores. Pedraza now claims that the government's decision not to subject Albores to a polygraph "was relevant to his credibility and to avoid any mistaken conclusion by the jury that he had taken and passed such a test."

The government responds that whether it required Albores to submit to a polygraph examination is not relevant to his credibility; and, in the alternative, any error was harmless because the remaining evidence against Pedraza was overwhelming. Pedraza's reply brief does not address the polygraph issue.

We review a district court's evidentiary rulings for an abuse of discretion. *United States v. Kilpatrick*, 798 F.3d 365, 378 (6th Cir. 2015). A court abuses its discretion when it "relies on clearly erroneous findings of fact, improperly applies the law, or

employs an erroneous legal standard," or when we are "firmly convinced" that the trial court "committed a clear error of judgment." *United States v. Miner*, 774 F.3d 336, 348 (6th Cir. 2014). "Non-constitutional errors are subject to Rule 52(a) harmless error analysis: the government must show by a preponderance of the evidence that the error did not materially affect the verdict." *Kilpatrick*, 798 F.3d at 378 (emphasis omitted).

Whether or not the government required Albores to take a polygraph examination would not have been admissible evidence, and the trial court did not err in refusing to allow such testimony. As the district court ruled, the government's exercise or lack thereof of its right to a polygraph of Albores was only relevant to "whether the United States believes [Albores] or not," a matter not at issue at trial. As this court has held, "Broad discretion is given to the district courts in determinations of admissibility based on considerations of relevance and prejudice, and those decisions will not be lightly overturned." *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 897 (6th Cir. 2004) (citing *United States v. Jackson-Randolph*, 282 F.3d 369, 376 (6th Cir. 2002)). Pedraza does not present any argument to surmount this high hurdle.

The decision was in any event harmless, because the evidence that Pedraza engaged in a conspiracy to distribute cocaine was overwhelming: Pedraza was heard on a call to a foreign number arranging the delivery of $312,000, later recovered from a different truck driver connected to the conspiracy; Pedraza arranged to pick up "28 pieces" from the foreign supplier, and 28 kilograms of cocaine eventually were recovered in this case; and Pedraza was heard via wiretap arranging the meeting with Orozco at which the cocaine changed hands. Investigators searching Pedraza's home

seized money ledgers that appeared to record drug payments and deliveries, and they seized drug distribution paraphernalia such as digital scales, vacuum-sealing machines, and a digital money counter.

Similarly, Pedraza's convictions for money laundering and possessing a machine gun were adequately and independently supported by evidence other than Albores' testimony.

**D. Objections to Hearsay Testimony (Pedraza)**

Pedraza also contests the admission of certain testimony. His first objection concerns DEA Agent Jared Sullivan's identification of Solis — the truck driver who was stopped with $312,000 in cash — as "the Volunteer." Agent Sullivan was the individual who located vacuum-seal bags while searching Pedraza's home. One bag had the word "Voluntario" (Spanish for "Volunteer") written on it. Agent Sullivan testified that "[w]hen that truck driver [Solis] called, he said, 'I'm calling on behalf of The Volunteer,' so that was significant to me." The government asked Agent Sullivan whether there was a particular individual that was identified as the Volunteer, and Agent Sullivan stated, "Well, Mr. Garza Solis, the truck driver, I believe either is 'The Volunteer' or was driving on behalf of 'The Volunteer.'"

Pedraza asserts that "the identification of 'The Volunteer' was entirely an out-of-court statement . . . introduced to prove its truth — the identity of 'The Volunteer.'" The jury, however, heard the very phone call in which Solis stated that he was calling on behalf of the Volunteer. Accordingly, Agent Sullivan's testimony was duplicative of the phone call on which it was based — and Pedraza did not object to the admission of that

phone call.  Any error in the admission of Agent Sullivan's testimony relaying the contents of the phone call was harmless.

Pedraza's second alleged error concerns DEA agents' testimony about records of funds that Pedraza used to purchase his house.  Pedraza notes that, over his objection, the trial judge ruled that the agents' testimony concerning the financial records was admissible under the business records exception, Fed. R. Evid. 803(6).  But Pedraza identifies no particular error in the trial court's ruling.  His assertion that the statements were hearsay is not inconsistent with the trial court's ruling that a hearsay exception applied.

### E.  Substantive Reasonableness of Sentence (Orozco)

Based on the quantity of drugs that the jury attributed to him, Orozco's mandatory minimum sentence was 120 months.  The sentencing judge determined the Guidelines range to be 121 to 141 months, the correctness of which Orozco does not dispute, and the judge sentenced Orozco to 140 months of imprisonment.  Orozco now challenges the substantive reasonableness of his 140-month sentence, arguing that he should have been sentenced at the low end of the Guidelines instead.

The substantive reasonableness of a sentence is reviewed under an abuse-of-discretion standard, and we may apply a presumption of reasonableness to sentences within the Guidelines range.  *Gall v. United States*, 552 U.S. 38, 51 (2007).  "A sentence will be found to be substantively unreasonable 'when the district court selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent [18 U.S.C.] § 3553(a) factors or gives an unreasonable amount of weight to any

pertinent factor.'" *United States v. Sexton*, 512 F.3d 326, 332 (6th Cir. 2008) (quoting

*United States v. Borho*, 485 F.3d 904, 908 (6th Cir. 2007)).

Orozco complains that his lack of criminal history and his positive standing in the

community were "barely" accounted for by the sentencing judge. He also asserts that his

sentence will not deter others from similar conduct any more than would a 121-month

sentence.

Orozco's arguments are without merit. The sentencing judge explicitly considered

Orozco's positive standing within his community, including his lack of a criminal

history; but the judge explained that Orozco's serious criminal conduct outweighed these

factors. Additionally, the judge's rationale was not limited to deterring the public at

large. He indicated that the sentence was calculated to deter Orozco from offending in

the future, and Orozco's argument that his sentence will not stop the illicit drug trade fails

to address this fact.

Because Orozco's argument "ultimately boils down to an assertion that the district

court should have balanced the § 3553(a) factors differently, it is 'simply beyond the

scope of our appellate review, which looks to whether the sentence is reasonable, as

opposed to whether in the first instance we would have imposed the same sentence.'"

*Sexton*, 512 F.3d at 332 (quoting *United States v. Ely*, 468 F.3d 399, 404 (6th Cir. 2006)).

## F. Guidelines Calculation (Gutierrez)

Gutierrez asserts that the sentencing judge violated *Apprendi* and *Alleyne* when he

found additional quantities of drugs attributable to Gutierrez as "relevant conduct." *See*

*Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Alleyne v. United States*, 133 S. Ct. 2151 (2013).

In the first superseding indictment, the government charged Gutierrez with conspiracy to distribute 5 kilograms or more of cocaine. On the verdict form, however, the jury indicated that Gutierrez was responsible for less than 500 grams of cocaine. Whereas a conspiracy conviction involving 5 kilograms or more of cocaine authorizes a statutory range of 10 years to life in prison, *see* 21 U.S.C. § 841(b)(1)(A)(ii)(II), the statutory penalty for conspiring to distribute less than 500 grams of cocaine is 0 to 20 years, *see* 21 U.S.C. § 841(b)(1)(C).

Invoking USSG § 2D1.1(c)(4), the sentencing judge found by a preponderance of the evidence that Gutierrez was in fact responsible for all 28 kilograms of cocaine, rather than just the amount found by the jury. When the judge accounted for this fact, it resulted in a base offense level of 32 and a Guidelines range of 121 to 151 months, instead of the range of 41 to 51 months that would have resulted from the jury's quantity finding alone. The judge sentenced Gutierrez to 136 months.

Gutierrez does not dispute that he was responsible for all 28 kilograms of cocaine. Rather, he claims that the judge's factual finding had the effect of "generat[ing] a mandatory minimum" of 10 years that was not permitted by the jury's quantity finding. Similarly, he argues that the judge's finding elevated the statutory maximum, from 20 years to life in prison. Gutierrez claims that this violated *Apprendi* and *Alleyne.*

We disagree. It is settled law that judge-found drug quantity amounts that adjust the Guidelines range, without exceeding the *statutory* range authorized by the jury,

comply with *Apprendi*.  "So long as the sentence falls within the statutory range prescribed for the jury conviction, a district court may sentence a defendant based on acquitted conduct because the standard of proof at sentencing is the lower preponderance of the evidence standard."  *United States v. Pritchett*, 749 F.3d 417, 433 (6th Cir. 2014).

Notwithstanding the judge's factual findings, he remained constrained by the statutory limit to the sentence that was generated by the jury's verdict, and Gutierrez's sentence was within that constraint.  The judge's determination of drug quantity did not result in a sentence that violated the statutory maximum of 20 years.  Nor is there any indication in the record that the sentencing judge believed that he was bound by a 10-year mandatory minimum as a result of his factual finding.

Finally, we reject Gutierrez's assertion that his sentence was substantively unreasonable under 18 U.S.C. § 3553(a)(1), because this assertion was unaccompanied by any legal argument.  "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived," and "[i]t is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."  *United States v. Robinson*, 390 F.3d 853, 886 (6th Cir. 2004).

**AFFIRMED**.